IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-03265-PAB-KLM

I.G., by and through her parent and guardian, GABRIEL GRUNSPAN, and
GABRIEL GRUNSPAN for himself,

      Plaintiffs,

v.

JEFFERSON COUNTY SCHOOL DISTRICT through the BOARD OF EDUCATION
FOR THE JEFFERSON COUNTY SCHOOL DISTRICT,

      Defendant.

---

## ORDER

---

This matter is before the Court on defendant's Motion to Dismiss Plaintiffs' First

Amended Complaint and Jury Demand [Docket No. 51]. The Court has jurisdiction

pursuant to 28 U.S.C. §§ 1331, 1367.

## I. BACKGROUND[1]

This dispute involves an alleged anti-Semitic environment at West Jefferson

Middle School ("the School"), a middle school located in Jefferson County, Colorado

within the Jefferson County School District ("the District"), and the actions that the

School, the District, and the Jefferson County School District Board of Education ("the

Board") took to remedy that environment. *See* Docket No. 49 at 2, ¶ 4. The Board is

---

[1] The Court assumes that the allegations in plaintiffs' complaint are true in
considering the motion to dismiss. *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir.
2011).

the governing body of the District and, therefore, of the School. *Id.*

Plaintiffs are a former student at the School, I.G.,[2] and her father, Gabriel Grunspan. *Id.* at 2, ¶¶ 3-4. Mr. Grunspan is Jewish. *Id.*, ¶ 3. I.G. identifies as Jewish and went to Israel for her bat mitzvah ceremony. *Id.*

The anti-Semitic activity began in the summer of 2016 when a swastika was painted on a wall of the School. *Id.* at 3, ¶ 8. Rather than reporting the swastika to law enforcement or to students and parents, the School painted over the swastika. *Id.* In September 2016, a student drew a swastika and wrote "Heil Hitler" on a piece of paper, which the student then gave to another student. *Id.* at 4, ¶ 9. A teacher discovered the note and reported it to the assistant principal. *Id.* The student's parents were contacted and the student was given a "one-day, in-school suspension." *Id.* No other actions were taken, despite the fact that "students were going through the hallways giving each other Nazi salutes and saying 'Heil Hitler.'" *Id.*

During a technology class on or about September 27, 2016, a student told a Jewish student that a cookie and a Jew were similar, "with the difference being that a cookie comes out of the oven." *Id.*, ¶ 10. The student proceeded to give a Nazi salute and loudly state "Heil Hitler." *Id.* The technology teacher did not report the events to school administration. *Id.* at 5, ¶ 12. The student, however, did. *Id.*, ¶ 13. Even though the student reported the incident to school administration, and had experienced anti-Semitic statements on three other occasions, the School did not notify the student's parents that their child had experienced anti-Semitic harassment. *Id.* at 4-5,

---

[2] The Court uses initials to protect the privacy of the minor student.

¶¶ 11, 13. The student who made the comments was given a "one-day, in-school suspension," and the principal met with the student's parents. *Id.* at 5, ¶ 13. No other action was taken. *Id.*

During class on September 29, 2016, a student told I.G. "that the Zika virus should be eradicated by gassing it, like the Jews." *Id.* at 6, ¶ 15. During the next period, the same student made the same comment to I.G., and also gave a Nazi salute. *Id.*, ¶ 16. The teacher for that class told I.G. "that she and the other student who experience [] anti-Semitic statement[s] should stick together and that [I.G.] should take the student under her wing because both were Jewish." *Id.*, ¶ 17. While "[t]his statement clearly showed that the teacher knew that anti-Semitic activity was occurring," the teacher "did not report the obvious racism and anti-Semitic activity." *Id.* at 6-7, ¶ 17. I.G. reported the anti-Semitic behavior and the teacher's comment to the principal the same day. *Id.* at 7, ¶ 18. An investigator from the District had a "brief conversation" with I.G., but the District did not take immediate steps to stop anti-Semitic behavior at the School. *Id.* at ¶ 19.

The School principal interviewed several students who corroborated that comments were made to I.G. *Id.*, ¶ 20. Those students also confirmed that anti-Semitic activity had been "going on for a considerable period of time and that lots of people (students) were doing it." *Id.* The student who made the comments to I.G. was given a "two-day, out-of-school suspension," although plaintiffs were never informed of any disciplinary action. *Id.*, ¶ 21. I.G. also experienced sexual harassment after reporting the September 29 incident; a male student "grabbed [I.G.] from behind" and commented

on I.G. reporting to the principal that she experienced anti-Semitic harassment. *Id.* at 9, ¶ 25.

From September through the remainder of 2016, students at the School "were giving Nazi salutes and verbally stating 'Heil Hitler' as they walked through the halls during class breaks." *Id.* at 6, ¶ 14. "[A]lthough teachers routinely were in the hallways during these breaks," the activity "went unreported for a substantial period of time." *Id.* The School administration "did not hold any meetings with teachers and other staff to tell them to be aware of potential anti-Semitic activity or how to address it . . . . Parents of student[s] were not informed about the problem at the school and parents were not asked to help remediate the situation." *Id.* at 8, ¶ 23. At some point during this period, Mr. Grunspan filed a complaint with the Department of Education, Office of Civil Rights division ("OCR"). *Id.* at 19, ¶ 66.

After I.G. made her complaint to the principal on September 29, 2016, Mr. Grunspan went to the School to discuss the situation. *Id.* at 9, ¶ 26. When he came back to the parking lot, he discovered three swastikas scratched into the side of his car. *Id.* On October 12, 2016, R. Craig Hess, the Chief Legal Counsel for the District, informed Mr. Grunspan that there was "merit to the Grunspan complaint that [I.G.] had been subjected to anti-Semitic comments. Mr. Hess' letter also claims that the principal had taken corrective action against the students and the school and would further conduct a school-wide educational program on anti-bullying and tolerance." *Id.* at 11, ¶ 38. Despite these assurances, I.G. "was still being targeted and harassed and treated unfairly," and Mr. Grunspan was not given any more information on whether

these programs were being put into effect.  *Id.* at 12-13, ¶¶ 39-41.

On December 21, 2016, the District put Mr. Grunspan on a "communication plan."  *Id.* at 12-13, ¶ 41.  The plan

> was that: 1) for concerns relating to West Jeff Middle School staff, Mr. Grunspan would have to e-mail or call Craig Hess, the attorney for the District; 2) [f]or school or district issues involving [I.G.], Mr. Grunspan was only to communicate with Becky Brown, the principal[,] or Mr. Cohan. Additionally, if Mr. Grunspan needed to meet with a West Jeff Middle School teacher, he had to make arrangements for such through Becky Brown or Mr. Cohan; and 3) [f]or GT or testing issues for [I.G.], Mr. Grunspan was required to contact Roger Dowd, the GT Director.

*Id.* at 13, ¶ 42.  Additionally, "[a]t an unknown date, which was before January 13, 2016, teachers and other personnel . . . were verbally given instructions . . . not to have direct communications with Mr. Grunspan without clearing them with the principal."  *Id.*, ¶ 43.[3]  Mr. Grunspan was informed that the communication plan "was tied directly to the fact that OCR was investigating" the District.  *Id.* at 17, ¶ 55.  The bar on communications "interfered with the ability of Mr. Grunspan to monitor his daughter's progress in school, to determine what problems existed that [I.G.] was facing and how she was recovering from [her] emotional trauma."  *Id.* at 13, ¶ 44.  While the communication plan was in effect, I.G. was receiving counseling from the school counselor "for the emotional trauma" that she was experiencing.  *Id.* at 14, ¶ 45.

---

[3] Although the complaint states that this occurred in 2016, such a date does not comport with the rest of the timeline.  The Court therefore believes that plaintiffs meant to allege January 2017.

On January 12, 2016,[4] I.G. gave a presentation to the Board "about the abuse and anti-Semitism that was occurring at [the School] and the administration's lack of sensitivity to the problem." *Id.* at 15, ¶ 50. In the months after I.G.'s presentation, "other anti-Semitic activity in Jefferson County public schools was reported." *Id.* at 15-16, ¶ 52. On January 19, 2017, at a meeting with school staff and teachers, Principal Brown "openly and overtly attacked [I.G.] for her outcry at the Board of Education. . . . Principal Brown claimed that [I.G.] had made untrue and false statements to" the Board. *Id.* at 17, ¶ 56.

"From December 2016 through February 2017," teachers were "uncooperative and not supportive relating to assignments and mentoring" of I.G. *Id.* at 18, ¶ 58. The principal became "openly hostile and confrontational" with I.G. and "attempted to learn about and invade confidential communications" between I.G. and the school counselor. *Id.* The principal "also engaged in conduct with a radio transmission that . . . disclos[ed] that [I.G.] was in counseling or seeing a counselor." *Id.* The School "refused or failed to transmit" I.G.'s transcripts "to several private schools to which" I.G. was applying for admission. *Id.*, ¶ 59. In March, 2017, I.G. transferred out of the District school system. *Id.*, ¶ 61.

Plaintiffs filed this lawsuit on December 19, 2018. Docket No. 1. Plaintiffs bring four claims for relief: (1) national origin and religious discrimination in violation of Title VI; (2) retaliation in violation of Title VI; (3) retaliation in violation of 42 U.S.C.

_____

[4] The Court again believes that plaintiffs intended to allege January 2017, not 2016.

§ 1983; and (4) promissory estoppel based on statements contained in the School student handbook.  Docket No. 49 at 20-26.

Defendant filed its motion to dismiss on July 12, 2019.  *See* Docket No. 51.  As to all of Mr. Grunspan's claims, defendant argues that Mr. Grunspan does not have prudential standing to assert the claims because they are either derivative of I.G.'s claims or because he is not in the zone of interests that the statutes are designed to protect.  *Id.* at 6-8.  Concerning I.G.'s discrimination claims in violation of Title VI and § 1983, defendant argues that I.G. has not alleged that defendant was deliberately indifferent to the anti-Semitic environment, that defendant took any retaliatory actions against I.G., or that, if there were retaliatory actions, there is any causal connection between the alleged retaliatory actions and I.G.'s protected activity.  *Id.* at 8-13.  For the promissory estoppel claim, defendant argues that a school handbook does not create enforceable promises and, as a result, the claim must fail.  *Id.* at 14-15.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions."). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then a plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

### A. Prudential Standing

Because it is dispositive as to Mr. Grunspan, the Court first addresses whether Mr. Grunspan has prudential standing to pursue his claims. In addition to the

constitutional requirements of Article III standing, a plaintiff must also have "prudential standing," which looks to whether the "statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *The Wilderness Soc. v. Kane Cty.*, 632 F.3d 1162, 1169 (10th Cir. 2011). "The prudential standing doctrine encompasses various limitations, including the general prohibition on a litigant's raising another person's legal rights." *Id.* at 1168 (quotations and citation omitted). "The plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Three of Mr. Grunspan's claims rely on I.G. having experienced the underlying discriminatory actions. Specifically, Mr. Grunspan's first claim for relief, national origin and religious discrimination in violation of Title VI, states that Mr. Grunspan "has suffered extra expenses for his daughter's education and his claims are derivative to those of" I.G. Docket No. 49 at 22, ¶ 76. Mr. Grunspan's third claim for relief, retaliation for exercise of his First Amendment rights in violation of 42 U.S.C. § 1983, states that Mr. Grunspan "suffered injury that was derivative of that of" I.G. *Id.* at 24, ¶ 92. Mr. Grunspan's fourth claim is one for promissory estoppel, which Mr. Grunspan alleges is also "derivative" of I.G.'s identical claim. *Id.* at 26, ¶ 103. The only claim that Mr. Grunspan does not allege is derivative of I.G.'s claim is his second claim for relief, a Title VI retaliation claim, with Mr. Grunspan alleging that defendant retaliated against him for reporting discrimination. *Id.* at 22, ¶ 80.

Mr. Grunspan does not have prudential standing to assert Title VI claims. To

bring a Title VI claim, a plaintiff must be the intended beneficiary of a federally funded school program. *See, e.g.*, *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *18 (S.D.N.Y. Sept. 27, 2012). Courts have consistently held that parents are not the intended beneficiaries of school programs and, therefore, may not assert Title VI claims on their own behalf. *See id.*; *see also Murray v. Lakeland Cent. Sch. Dist. Bd. of Educ.*, 2017 WL 4286658, at *8 (S.D.N.Y. Sept. 26, 2017); *R.W. ex rel. Williams v. Del. Dep't of Educ.*, 2008 WL 4330461, at *3 (D. Del. Sept. 22, 2008); *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996) ("The intended beneficiaries of a federally funded public school program are school children, not their parents."); *see also Johnson v. Dodson Pub. Sch.*, 2006 WL 8435827, at *4 (D. Mont. May 4, 2006) (holding that a parent may bring a Title VI claim for injunctive relief only). Since he is not an intended beneficiary of a federally funded school program, the Court finds that Mr. Grunspan does not have prudential standing to bring Title VI claims on behalf of himself.

A plaintiff may not bring a § 1983 claim that is derivative of another person's § 1983 claim. *See Patrick v. Success Acad. Charter Sch., Inc.*, 354 F. Supp. 3d 185, 208 (E.D.N.Y. 2018) ("To the extent Plaintiff Patrick seeks to bring her own due process claims . . . the Court finds that Patrick's individual procedural due process claims must be dismissed because she lacks standing."); *HB*, 2012 WL 4477552, at *19 ("[A]lthough parents may sue on behalf of their minor child, they do not have standing to assert claims on their own behalf for a violation of their child's rights."); *Williams*, 2008 WL 4330461, at *4 (holding that, because a § 1983 claim refers to a

child's rights, the parent "does not have standing to assert that her rights were violated"); *Jarmon v. Batory*, 1994 WL 313063, at *5 (E.D. Pa. June 29, 1994) (finding that the parents of a child suspended from school could not bring § 1983 claims because their claims were "wholly derivative" of their child's claims). The amended complaint unequivocally states that Mr. Grunspan's claim is derivative of I.G.'s. Docket No. 49 at 24, ¶ 92 ("Mr. Grunspan suffered injury that was derivative of that of [I.G.], including extra costs relating to providing for her education."). As a result, the Court finds that Mr. Grunspan does not have prudential standing to assert his claim under § 1983.

The Court therefore finds that Mr. Grunspan does not have prudential standing to assert his first, second, and third claims for relief.

Although it is not entirely clear that Mr. Grunspan has prudential standing to assert his fourth claim for promissory estoppel, for purposes of this order, the Court assumes that he does and addresses that claim next.

## B. Promissory Estoppel

Plaintiffs' fourth claim for relief is one for promissory estoppel based on alleged promises contained within a school handbook that outlines various school procedures, including means of reporting and combating discrimination. Docket No. 49 at 25, ¶¶ 94-97. Plaintiffs allege that the handbook contained "express and implied promises . . . relating to reporting discriminatory behavior, bullying and other forms of harassment." *Id.*, ¶ 98. The complaint alleges that I.G. relied on the promise contained in the handbook that she would not be subject to retaliation when she

11

reported the discrimination that she experienced.  *Id.*, ¶¶ 99-100.

Defendant argues that plaintiffs cannot establish a claim for promissory estoppel for three reasons: (1) plaintiffs cannot assert a promissory estoppel claim for the same relief requested under Title VI; (2) a school handbook cannot be used as a basis to establish promissory estoppel; and (3) plaintiffs fail to allege that I.G. reasonably relied, to her detriment, on the promises in the handbook.  The Court agrees with defendant that plaintiffs have failed to state a claim on which relief may be granted and therefore declines to reach the question of whether Title VI preempts a common law claim for promissory estoppel.  Because promissory estoppel is a state law claim, the Court applies Colorado law.  *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).

Promissory estoppel requires four elements: "(1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that promise would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice."  *Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996).  Colorado has adopted the Second Restatement of Contract's approach to promissory estoppel.  *See Bd. of Cty. Comm'rs v. Delozier*, 917 P.2d 714, 716 (Colo. 1996).

The Court finds that Mr. Grunspan has failed to state a claim for promissory estoppel.  The amended complaint states that I.G. "affirmatively relied" on the handbook and that defendant is "liable to Mr. Grunspan as a derivative claim for the

extra costs of education that were incurred."  Docket No. 49 at 25-26, ¶¶ 99, 104.  But Mr. Grunspan has failed to cite any authority for the proposition that promissory estoppel works in the derivative fashion that he alleges.[5]  In response to the motion to dismiss, Mr. Grunspan argues that "Mr. Grunspan . . . *could* reasonably rely on the [h]andbook."  Docket No. 55 at 15 (emphasis added).  He does not contend that he *did* rely on the handbook and, in fact, the complaint contains no allegations that Mr. Grunspan even read the handbook, let alone relied on it.  *See* Docket No. 49 at 25.  Thus, assuming that the first and second elements of promissory estoppel are sufficient alleged, Mr. Grunspan has failed to allege that he, the "promisee," "in fact reasonably relied on the promise[s]" allegedly contained in the student handbook.  *Berg*, 919 P.2d at 259.  Mr. Grunspan has therefore failed to state a claim for promissory estoppel.

The Court also finds that I.G. has failed to sufficiently plead a claim for promissory estoppel.  I.G. makes the following allegations: (1) defendant issued to I.G. a student handbook; (2) that handbook contains a promise that there will be no retaliation for reporting of discrimination; (3) I.G. "affirmatively relied" on the handbook when she reported the discrimination; (4) her reliance was reasonable "given her age" and the School's status as a governmental entity; and (5) she was retaliated against for reporting discrimination.  Docket No. 49 at 25, ¶¶ 94-101.

---

[5] It is true that reliance by third party *beneficiaries* may be actionable under a theory of promissory estoppel, but Mr. Grunspan does not make that argument and, more importantly, the statements in the handbook were not made to I.G. "for the benefit" of Mr. Grunspan.  Restatement (Second) of Contracts § 90 cmt. c. (Am. Law. Inst. 1981).

The Court begins by noting that I.G. has failed to cite any authority – Colorado or otherwise – for the proposition that a public school student handbook can form the basis of a promissory estoppel claim. Rather, plaintiff cites *Jaynes v. Centura Health Corporation*, 148 P.3d 241 (Colo. App. 2006), and *Continental Airlines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987), for the proposition that a school handbook can be the foundation of a claim for promissory estoppel. However, both of those cases are inapposite.

First, *Continental Airlines*, the case on which *Jaynes* relies, resolved the limited question of "whether an *employee* may sue an *employer* for breach of contract on the theory that an employee manual, unilaterally published by the employer, may serve as a basis for altering the terms of an employment otherwise terminable at will." 731 P.2d at 710 (emphasis added). The bulk of *Continental Airlines* is dedicated to answering that question – one of employment and breach of contract – and not promissory estoppel and school handbooks.

Continental Airlines states that an

> *employee* would be entitled to enforce the termination procedures under a theory of promissory estoppel if he can demonstrate that the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the termination procedures, that the employee reasonably relied on the termination procedures to his detriment, and that injustice can be avoided only by *enforcement of the termination procedures*.

*Id.* at 712 (emphasis added). The Colorado Supreme Court allowed promissory estoppel to go forward in an employment context – not in a public school context – and *Continental Airlines*, on that basis alone, does not support I.G.'s claim. *Jaynes*

14

merely applied *Continental Airlines* to another employment situation and, therefore, it also does not support I.G.'s claim for promissory estoppel. *See Jaynes*, 148 P.3d at 247.

However, even if *Continental Airlines*, and thus *Jaynes*, did stand for the proposition that a public school handbook could form the basis of a promissory estoppel claim, I.G. still would not have stated a claim for promissory estoppel. *Continental Airlines* allows a claim for promissory estoppel to move forward if "injustice can be avoided *only by enforcement of the termination procedures*." 731 P.2d at 712 (emphasis added). Thus, in the employee handbook context, the particular promise alleged is what must be enforced. Here, I.G. alleges that defendant promised to not retaliate against her for reporting discrimination. Docket No. 49 at 25, ¶¶ 97, 99. The Court cannot order defendant to take back the alleged retaliation that already has occurred.

Additionally, I.G. does not sufficiently allege how she relied on the handbook to her detriment. I.G. appears to be arguing that she would not have reported the discrimination had she known that she would be retaliated against, but she does not make that argument. Rather, I.G. states that she "affirmatively relied" on the handbook without offering more. *Id.*, ¶ 99. This is a mere recitation of the elements of promissory estoppel and a conclusory allegation. As a result, the Court need not accept those allegations. *See Hackford*, 14 F.3d at 1465. I.G. has not stated that she "changed [her] position based on [the] content" of the handbook or that she attended the School "because of any representation in the student guide" or that she

15

"would have attempted to attend some other school but for [her]" reliance on the guide. *See Higginbottom ex rel. Davis v. Keithly*, 103 F. Supp. 2d 1075, 1082-83 (S.D. Ind. 1999) (rejecting parents' promissory estoppel claims based on representations in a student handbook). Additionally, I.G. has not alleged any damages whatsoever that she personally incurred that the Court could compensate through normal contractual remedies. *See* Restatement (Second) of Contracts § 90 cmt. d. (Am. Law. Inst. 1981) ("A promise binding under this section is a contract, and full-scale enforcement by normal contractual remedies is often appropriate."); *Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1221 (Colo. 2016) (noting that, where the elements of promissory estoppel "are present, a promise becomes binding and may be enforced through the normal remedies available under contract law").

Therefore, plaintiffs have failed to state a claim for promissory estoppel.

### C.  Title VI Discrimination Based on National Origin or Religion

I.G. brings a Title VI hostile environment claim. Docket No. 49 at 20. A claim for Title VI hostile environment requires plaintiff to allege "that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) (alterations, quotations, and citations omitted). The Court finds that I.G. has sufficiently pled each of the four elements.

First, as to actual knowledge, I.G.'s complaint contains numerous allegations that discrimination was repeatedly reported to school and district officials. Specifically, I.G. alleges that teachers were aware of the anti-Semitic environment, that she reported it to the principal, and gave a speech to the Board. *See id.* at 6-7, 15, ¶¶ 14, 18, 50. Defendant does not contest that it was made aware of the discrimination but, rather, argues that it was not deliberately indifferent to the discrimination. Docket No. 51 at 9-10. The Court finds that plaintiff's allegations are sufficient as to the first element.

Second, the complaint contains numerous allegations that defendant was deliberately indifferent to the hostile environment. "Deliberate indifference in this context can also be phrased as an 'intentional choice to sit by and do nothing.'" *K.D. by Nipper v. Harrison Sch. Dist. Two*, No. 17-cv-2391-WJM-NRN, 2018 WL 4467300, at *6 (D. Colo. Sept. 18, 2018). I.G. alleges that defendant continually turned a blind eye and that the problem persisted, even after the issue was brought to the attention of the School. Docket No. 49 at 6, ¶ 14 (alleging that Nazi salutes and students saying "Heil Hitler" continued throughout 2016). Defendant argues that I.G.'s complaints are "really a summary of all the reasons why Plaintiffs disagree with how the School District responded to offensive student conduct." Docket No. 51 at 10. While it is true that I.G. alleges that some action was taken, I.G. also alleges that some circumstances were never addressed or redressed ineffectually. Docket No. 49 at 6, ¶ 14. This is sufficient, at this stage, to allege that defendant either "facilitated the hostile environment or, in the least, permitted it to continue." *Bryant*, 334 F.3d at

17

933.

Third, I.G. sufficiently alleges that the hostile environment was "severe, pervasive[,] and objectively offensive." *Id.* at 934. I.G. alleges that students were giving Nazi salutes, saying "Heil Hitler," wearing swastikas, and referencing gas chambers used to kill Jews during the Holocaust. Docket No. 49 at 10, 21, ¶¶ 33, 72. Defendant does not contest this element, and the Court finds that I.G.'s allegations are sufficient.

Fourth, the Court finds that I.G. has sufficiently alleged that she was deprived "access to the educational benefits or opportunities provided by the school." *Bryant*, 334 F.3d at 934. I.G. alleges that she was forced to drop a class, suffered academic difficulties, and ultimately was forced transfer out of the School. Docket No. 49 at 21, ¶ 74. These are sufficient allegations at this stage.

### D.  Retaliation in Violation of Title VI

I.G.'s second remaining claim is for retaliation in violation of Title VI. Docket No. 49 at 22. The Court finds that I.G. has stated a claim for relief.

Although Title VI does not explicitly create a claim for retaliation, courts have held that such a cause of action exists. *See L.L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 551 (3d Cir. 2017) (unpublished) (citing *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003)); *Peters*, 327 F.3d at 320; *Shinabargar v. Bd. of Trs.*, 164 F. Supp. 3d 1, 16 n.8 (D.D.C. 2016) (collecting cases); *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 43 (D.D.C. 2009). To state a claim for retaliation in violation of Title VI, a plaintiff must allege: "(1) that she engaged in protected activity; (2) that she

suffered a material adverse action; and (3) that a causal connection existed between the protected activity and the adverse action." *L.L.*, 710 F. App'x at 551 (citing *Peters*, 327 F.3d at 320) (quotations omitted). Defendant does not contest that I.G.'s various reports of discrimination at the School were protected activity, and the Court agrees that these activities were protected. Therefore, the Court focuses its analysis on the second and third prongs of a Title VI retaliation claim.

I.G. makes several allegations that relate to whether "she suffered a material adverse action" in response to her protected activity of reporting discrimination at the School. *L.L.*, 710 F. App'x at 551. The relevant allegations are: (1) teachers and staff, including I.G.'s school counselor, were instructed to talk to I.G.'s father, Mr. Grunspan, only in limited circumstances: (2) the principal of the School, Principal Brown, told teachers and staff that I.G. was lying about the discrimination that she experienced; (3) "teachers were uncooperative and not supportive relating to assignments and mentoring" of I.G.; (4) Principal Brown "became openly hostile" and "attempted to learn about . . . confidential communications" between I.G. and her school counselor; (5) Principal Brown made a "radio transmission" that disclosed that I.G. was in counseling; (6) the District and the School "refused or failed to transmit" I.G.'s transcripts when she was applying to private schools. Docket No. 49 at 16-18, ¶¶ 54, 56, 58-59.

The Court finds that these allegations are sufficient to state that I.G. suffered a material adverse outcome from her reporting. I.G.'s allegations demonstrate that her private counseling was disclosed, including an attempt by Principal Brown to gain

access to her counseling records.  *Id.* at 18, ¶ 58.  Although it was Mr. Grunspan who was prohibited from communicating with teachers and staff, the complaint alleges that the communication plan made it difficult for Mr. Grunspan to check in with his daughter and ensure that I.G. was receiving an adequate education, which the Court finds is an adverse outcome for I.G.  *Id.* at 13, ¶ 44.  Finally, I.G. alleges that teachers became uncooperative and unsupportive as a result of her reporting and Principal Brown's statements to teachers and staff, which is another adverse outcome.  *Id.* at 18, ¶ 58.

In its motion to dismiss, defendant argues that the principal's statement to staff and teachers about I.G. does not constitute an adverse action.  Docket No. 51 at 11.  However, allegedly defamatory actions can constitute an adverse action.  For example, in *Kimmel*, 639 F. Supp. 2d at 43, the plaintiff alleged that the university retaliated against the plaintiff's reporting by "spreading falsehoods" to a newspaper.  *Id.*  While the principal's statements did not extend to a news publication, the "falsehoods" that I.G. alleges were spread to teachers and staff did result in uncooperative and unsupportive teachers.  Docket No. 49 at 18, ¶ 58.  To the extent that defendant argues that, even if the principal's statement constitutes adverse action, it was the only instance of adverse action, the Court finds that argument unpersuasive.  I.G. has alleged several adverse actions, as discussed above.  In reply, defendant changes the focus of its argument from whether there were any adverse actions to whether I.G. alleged any causal nexus.  Docket No. 59 at 7-8.

To state a claim for Title VI retaliation, there must be a causal nexus between the alleged adverse action and the protected activity. *L.L.*, 710 F. App'x at 551. To establish causality by temporal proximity alone, the proximity between the protected action and the adverse action "must be very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). "Six weeks between the protected activity and the adverse action is sufficient, but three months is insufficient." *Shahmaleki v. Kan. State Univ.*, 2016 WL 3522040, at *6 (D. Kan. June 28, 2016) (citing *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)). I.G.'s reporting of discrimination appears to have taken place primarily between September 2016 and January 2017, including her presentation to the Board. However, the timeline that I.G. provides is unclear. At points, I.G. alleges that her presentation to the Board was in January 2016, Docket No. 49 at 15, ¶ 50, and, at other times, she alleges that it took place in January 2017. *Id.* at 23, ¶ 85. Furthermore, I.G. filed an OCR complaint sometime in 2016, although I.G. has not clearly alleged when that filing took place. *Id.* at 19, ¶ 66. If I.G.'s reporting took place between September 2016 and January 2017, there would be a "very close" temporal proximity between the protected activity and the adverse actions, *Breeden*, 532 U.S. at 273, which would be sufficient at this stage in the litigation.

However, because the timeline of events is unclear, the Court cannot rely solely on temporal proximity. If I.G.'s reporting took place in January 2016, like the complaint sometimes alleges, temporal proximity alone would be insufficient to state a plausible claim. That said, I.G.'s allegations form a larger story that demonstrates

causality on more than mere temporal proximity. I.G. alleges that the communication plan was put in place as a result of her father's complaint with OCR. Docket No. 49 at 16, ¶ 54. I.G. also alleges that the principal's statements about her, and the lack of support she received from teachers, was a direct result of the OCR complaint and her presentation to the Board. *Id.* at 17, ¶ 56. While the various adverse actions and reporting might have taken place over the course of a year, I.G.'s allegations taken together make a plausible claim for a causal connection. I.G. has therefore stated a claim for retaliation in violation of Title VI.

### E. Retaliation in Violation of § 1983

I.G.'s final remaining claim is one for retaliation in violation of § 1983. *Id.* at 23. To state a claim "against a defendant who is neither an employer nor a party to a contract with the plaintiff," the plaintiff must allege that (1) she "engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Smith v. Plati*, 258 F.3d 1167, 1176 (10th Cir. 2001) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). Elements one and three are substantively identical to elements one and three of a claim for retaliation under Title VI, and defendant's motion does not contest those elements. The Court therefore finds that I.G. has made sufficient allegations under elements one and three for the same reasons stated above.

The Court finds that I.G.'s allegations, at this stage, are sufficient to demonstrate that a person of "ordinary firmness" could be chilled by defendant's response to her reporting. *Id.* First, the Court notes that any allegations involving retaliation that occurred before I.G.'s presentation to the Board are insufficient to satisfy this element. I.G. complained of discrimination to teachers and school administration up to her presentation to the Board. The fact that I.G. continued to make reports of discrimination to various members of the school community demonstrates that she was not chilled from reporting discrimination. For example, in *Plati*, the plaintiff continued to maintain a website that the defendant had retaliated against plaintiff for making. 258 F.3d at 1177. The Tenth Circuit reasoned that the plaintiff's "persistence in maintaining his website offers some evidence that Plati's actions did not" chill or prevent his speech. *Id.* at 1177. Therefore, only defendant's adverse actions taken after the board presentation are material in determining whether a person of ordinary firmness would be chilled from exercising their First Amendment rights.

I.G. alleges that the following adverse actions took place after the Board presentation: (1) Principal Brown complained about I.G. to school teachers and staff; (2) Principal Brown made a radio transmission disclosing that I.G. was receiving counseling; (3) Principal Brown attempted to gain access to I.G.'s confidential counseling records; and (4) the School refused to transmit I.G.'s records to schools to which I.G. was attempting to transfer. Docket No. 49 at 18, ¶¶ 58-59. The Court finds that these actions could chill the speech of a person of ordinary firmness.

23

The cases which defendant cites in its reply are inapposite. First, the Tenth Circuit's decision in *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996), occurred before the Tenth Circuit developed the test for retaliation in violation of § 1983. *Id.* Second, that case did not deal with retaliation for exercising First Amendment rights, but for directly infringing on the plaintiffs' right to free speech. *Id.*

Second, *Pierce v. Chene*, 2017 WL 3600458, at *10 (D.N.M. Feb. 1, 2017), does not stand for the proposition that the types of allegations made here could not chill speech. In *Pierce*, a parent reported to the Albuquerque Public School system that her child's school had been improperly responding to bullying. *Id.* at *2-*4. As relevant here, her child was eventually disenrolled from school. *Id.* at *6. The court reasoned that the involuntary disenrollment could chill the parents' speech because "the disenrollment of their children forced the Pierces to choose between the education they thought best for their children and their First Amendment rights." *Id.* at *10. I.G.'s allegations demonstrate a similar conundrum: she could choose between receiving the education she felt she needed and wanted, or she could continue to report discrimination.

Third, while *Jenkins v. Rock Hill Local School District*, 513 F.3d 580, 588-89 (6th Cir. 2008), dealt with actions different than what occurred here – the making of a false report to Children Services and the dismissal of a child from school – the case says nothing about whether the types of actions alleged here could chill speech. The Court therefore finds defendant's argument unpersuasive and that I.G. has stated a claim for relief.

## IV. CONCLUSION

For these reasons, it is

**ORDERED** that defendants' Motion to Dismiss Plaintiffs' First Amended Complaint and Jury Demand [Docket No. 51] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that all claims by Gabriel Grunspan against Jefferson County School District are dismissed with prejudice.  It is further

**ORDERED** that I.G.'s fourth claim for relief is dismissed with prejudice.

DATED April 7, 2020.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge